No. 97,683

STATE OF KANSAS, *Appellee*, v. GREGORY A. MOORE, *Appellant*.

(194 P.3d 18)

Opinion filed October 24, 2008.

*Reid T. Nelson*, of Capital and Conflicts Appellate Defender Office, argued the cause and was on the brief for appellant.

*Jared S. Maag*, deputy solicitor general, argued the cause, and *Paul J. Morrison*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Gregory A. Moore appeals from his convictions on one count of capital murder, four counts of attempted capital murder, one count of aggravated kidnapping, and one count

of criminal possession of a firearm. We address three issues: (1) whether the district judge should have instructed Moore's jury on voluntary manslaughter based on imperfect self-defense; (2) whether the district judge should have instructed the jury on voluntary intoxication; (3) whether the district judge should have admitted testimony from a defense toxicology expert. The second and third issues are intertwined.

### Factual and Procedural Background

Shortly after midnight on April 9, 2005, Newton police were dispatched to Moore's residence on a domestic disturbance call. Officers met outside with H.A., the 14-year-old daughter of Alveda Sparks, who lived at the residence with Moore. H.A. told officers that Moore was holding her mother inside and was beating her. H.A. had run outside and called 911 on her cell phone. H.A. warned officers that Moore had a handgun tucked into the waistband of his pants. Officers knew Moore as a serious substance abuser; he was known to have recently used methamphetamine and was under surveillance by officers for suspicion of manufacturing methamphetamine. Moore was also known to be combative and violent toward law enforcement. The officers at the scene called in an emergency response team (ERT).

Detective Townsend Walton, who was outside the residence, attempted to reach Moore on his cell phone without success. About 3 a.m., Sparks called 911 and spoke to Harvey County Undersheriff Steve Bayless at dispatch. Sparks told Bayless that H.A. had overreacted, that nothing bad was going on, that Moore did not have a gun, and that she and Moore wanted H.A. to come back home. Walton called Moore shortly thereafter and talked with him from outside the residence. Moore assured Walton that, although he had a crossbow, he did not have any firearms.

At Walton's behest, Moore agreed to speak with Walton and Bayless through the front door. The officers asked Moore to show Sparks to them so that they could verify her safety. Moore obliged by turning on a light. Sparks was sitting on the couch, putting on her shoes. Walton asked Moore to allow Sparks to leave the residence, and Walton heard Sparks tell Moore that she was leaving.

When Moore turned around to argue with Sparks, Walton saw a magazine clip in Moore's waistband before Moore slammed the door.

Officers heard a dull thud, consistent with someone being struck, and they heard Sparks screaming. Walton then broke glass in or near the door, reached into the house, and unlocked and opened the door. Sparks warned officers that Moore had a gun; and the officers waved in ERT members. As the officers, their weapons drawn, entered the residence, Sparks ran out and Moore began firing. Moore's shots struck Harvey County Deputy Sheriff Kurt A. Ford in the head and Hesston Police Detective Christopher D. Eilert in a calf, a shoulder, and both hands. Moore also fired at Walton and Harvey County Sheriff Investigator B.J. Tyner. The officers had not fired; except for Tyner, who returned fire after Ford and Eilert fell. Walton and Newton Police Officer Tony Hawpe pulled Ford and Eilert from the residence, and the ERT members withdrew. Ford died of his wounds.

Moore called Walton and told him he was "reloaded and ready for more blood." When Moore learned from a friend that he had shot two officers, he called Walton again. Walton remained in contact with Moore by phone for more than 4 hours before Moore finally surrendered to law enforcement about 8 a.m. During the 4 hours, Moore learned that one of the officers was dead, and he said that he was convinced he would be shot if he emerged from his home. Moore also told Walton that he had been defending himself and that, if any officers tried to come into his home, he would shoot them.

Moore was charged with one count of capital murder in violation of K.S.A. 21-3439(a)(5), two counts of attempted capital murder under the same subsection and K.S.A. 21-3301 for his shooting of Eilert and Tyner; one count of aggravated kidnapping under K.S.A. 21-3421; and one count of criminal possession of a firearm contrary to K.S.A. 21-4204. In an amended complaint, the State added two more counts of attempted capital murder for the shots fired at Walton and Bayless.

Moore's counsel filed a motion to determine his client's competency, and the district court ordered Moore committed for eval-

uation. Moore was determined to be competent to stand trial. His original Kansas Death Penalty Unit lawyer was allowed to withdraw because of a conflict. Moore then was represented by a lawyer from the Northeast Kansas Conflict Office.

The defense filed many other pretrial motions, most of which are not pertinent to the issues on this appeal. Two, however, have potential to affect resolution of the three issues before us.

First, Moore desired to introduce evidence of his paranoia about police and evidence of injuries he sustained when he surrendered. He acknowledged that this strategy could open the door for the State to argue that he resisted arrest, but he sought through a motion in limine to exclude his two prior convictions for battery on law enforcement officers. The district judge sustained the motion in limine but cautioned Moore that the prior convictions would come into evidence if Moore opened the door by introducing evidence of his history of violence against law enforcement.

Moore provided the State with the report of his toxicology expert, Dr. Terry Martinez. At a *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), hearing regarding Martinez' proposed expert testimony, the State acknowledged that Moore's urine screen, done at the hospital after his arrest, suggested the presence of methamphetamine. The State argued, however, that its expert would testify that Martinez' method of extrapolating backward from urine screen values to suggest that Moore had ingested near-lethal doses of methamphetamine before the crimes was scientifically unreliable, and that even literature relied upon by Martinez stated as much. The State maintained that such extrapolations could only be made reliably from blood tests, and no blood samples were taken from Moore. The defense argued that Martinez' testimony would be pure opinion and that its introduction in the guilt phase of trial would support an instruction on voluntary intoxication. The district judge informed the parties that Martinez could not testify unless he could support his scientific method through the professional literature.

During opening statement, the prosecution introduced its theory of the case: that Moore had beaten Sparks and held her against her will and that, when police were called, he decided to go down

in a blaze of glory, planning to "blast" as many police officers as he could even though it might cost him his life.

Moore, on the other hand, suggested that the crimes arose from a perfect storm, a coincidence of events that he did not want or intend. Under this interpretation of the facts, Moore believed that he was going to die that night—that he would be shot to death by police if they entered his home or he left it. Laboring under this belief, when Moore saw the ERT members come inside in full gear and with weapons drawn, he panicked and did what he honestly believed he had to do to defend himself. Consistent with this theory, Moore's counsel pointed out that, after Moore fired and saw officers fall, Moore did not shoot at the comrades who dragged them away. Instead, he immediately called police and eventually surrendered.

The State called H.A., who testified about the events leading up to the stand-off. She testified that Moore and her mother had begun arguing; that he had pulled a bedroom door off its hinges and had broken a broomstick over his knee and held it to Sparks' throat. He also had punched H.A.'s dog. H.A. testified that Moore had a gun and would not let her mother leave when she wanted to do so. Eventually, Sparks told H.A. to go outside and call the police, which she did. The audio recording of H.A.'s 911 call was admitted into evidence and then played for the jury. On cross-examination, H.A. testified that generally Moore was nice and she liked him. When he drank, she said, he became mean, violent, and paranoid. She testified that she did not think Moore had been drinking the day or evening before the crimes, but she did not know.

Bayless also testified about the events of the evening; and Sparks' 911 call, during which Bayless spoke with Moore, was admitted into evidence and then played for the jury.

Scott Powell and Marc Smith of the Newton Police Department, who were present at Moore's residence at the time of the crimes, gave testimony substantially similar to Bayless'. Brian Rousseau, an ERT member, testified about ERT training, strategy, and the events of the evening. Walton also testified at some length.

Sparks testified that she and Moore had been arguing off and on all night April 8, continuing into April 9. Her account of events

was similar to H.A.'s. At one point, she said, Moore lunged at her. Her testimony was inconsistent on whether Moore hit her, but she agreed that she eventually directed H.A. to go outside and call police. At that point, Moore was armed with at least one gun. Once Moore became aware that police were coming, Sparks testified, he "started freaking out," grabbing another pistol and a shotgun, and made Sparks get into a closet with him. He told her that he was not going to go to jail, that the police were going to try to shoot him, that there would be a "shootout" and "bloodbath," and that she would die with him. He also said that the confrontation would be her fault.

Sparks testified that she told Moore she needed to use the bathroom. Moore forced her to get into the shower with him, and they stayed in the shower until the hot water ran out. Sparks said she did not want to be naked when the police came in, and she began putting her clothes back on. This angered Moore, and he hit her in the shin with the gun and threatened to shoot her heel off. When he put two guns to her ribs, the phone rang. The police were outside and trying to reach them.

Sparks eventually called 911, and she and Moore both talked with police. Although she testified at trial that she was afraid of Moore, on the phone she told police that Moore did not have a gun; and she heard Moore tell police the same thing. She testified that Moore agreed to talk with police at the front door, and he put the guns under the mattress in the bedroom. While Moore was talking with the officers, Sparks came into the front room with a bag she had packed and began putting on her shoes. Moore saw her and said that he thought she had said she would not leave. He then slammed the door and punched her in the hip, and she screamed. Sparks testified that, when Moore then headed back to the bedroom, she believed he was going for the guns. She was afraid for her life and ran out the door where the officers were gathered.

On cross-examination, Sparks testified that Moore had a drinking problem, that he used prescription painkillers for a back injury, and that he had begun using illegal drugs, including methamphetamine. When he was using these substances, she said, he became

mean, violent, and angry, all of which he was at the time of the crimes. When asked if she had seen Moore consume any alcohol or methamphetamine on April 8 or 9, she said that she had not.

Ed Bartkoski of the Kansas Bureau of Investigation (KBI) testified that, when he processed the crime scene, he discovered two firearms in defendant's residence—one in the kitchen, one in the bedroom. Each weapon was fully loaded, one with hollow point ammunition. Bartkoski testified that multiple shell casings were recovered from the scene consistent with the loaded weapons. In addition, the KBI recovered seven rifles and four shotguns from the residence, along with accompanying ammunition; a bullet-proof vest; drug paraphernalia consistent with narcotic use; and prescription pain medication.

Two casings found at the scene were consistent with a weapon issued to law enforcement. Tyner's testimony covered the weapons, gear, and armor used by the ERT. Tyner had been carrying a .40 caliber pistol and a shotgun; Ford had been carrying a rifle; and Eilert had a submachine gun. Tyner testified that the team entered out of its usual formation. Although Tyner was supposed to enter first with a ballistic shield, he was knocked out of the "stack" when Sparks ran out of the home. Thus, Ford entered first, followed by Eilert and then Tyner. When Moore fired, Ford and Eilert fell, and Tyner fired his pistol. Rousseau and Officers Maurice Montano and Brian Hall entered from the back of the home.

Tyner also testified that the ERT initially planned to enter the home to rescue Sparks. When she ran out, they were already committed to entry; so their goal changed from hostage rescue to effecting Moore's arrest.

Eilert provided substantially similar testimony concerning the events, and he discussed his injuries.

Thomas Curt Taylor, a long-time friend of Moore, testified that he woke up on April 9 with a feeling "something was wrong with [Moore]." Taylor called Moore, who told him that "all hell broke loose." Moore said he had just "shot a cop," that he had "blasted the cops." Moore also told Taylor that he was not going to jail; rather, he was going out in a "blaze of glory," an exit that Moore

had often mentioned. Taylor said he encouraged Moore to surrender, but Moore was "not wanting to surrender at all."

Taylor also said Moore talked about his experience in the military police, and he related an anecdote in which Moore had refused to relinquish his firearm because, he said, he was a soldier and that was how he was trained. Taylor also testified that Moore struggled with alcoholism and had begun using illicit drugs. Taylor said Moore could be mean and paranoid when drinking. Taylor did not specifically testify about his impression of Moore's sobriety during their phone conversation, but he said that it seemed Moore was "in a zone."

Amy Coody, a KBI firearm and toolmark examiner, testified that Moore's two pistols discharged multiple rounds, including the bullet recovered from Ford's head, and that the only officer's weapon that had been fired was the .40 caliber pistol, presumably Tyner's.

Dr. Larry Czarnecki, the Sedgwick County medical examiner who performed Ford's autopsy, testified that Ford's head wound was fatal. He also testified that the shot was not fired from close or point-blank range but, rather, from a distance between a few feet and multiple yards away.

On behalf of the defense, Raymond E. Riniker, an investigator for the Kansas Death Penalty Unit, testified that he discovered large quantities of full, partially full, and empty beer and liquor bottles at Moore's residence.

Moore requested an instruction on voluntary manslaughter based on imperfect self-defense and on voluntary intoxication, the second conditional on the district judge's evaluation of Martinez' testimony.

Out of the presence of the jury, Martinez took the stand. He referred to several scientific texts in addition to his own experience, including Baselt, Disposition of Toxic Drugs and Chemicals in Man (7th ed. 2004), and Levine, Principles of Forensic Toxicology (2d rev. ed. 2006), and testified about his evaluation of the results of Moore's urine screening. Martinez said that—at 8:35 the morning of his arrest—Moore's urine contained more than 7,500 nanograms per milliliter of methamphetamine and 2,709 nanograms per milliliter of amphetamine; and it had a pH of 6. Martinez said am-

phetamine is the major metabolite of methamphetamine, and it is generally accepted in the scientific community that the expected ratio of methamphetamine to amphetamine is 10 to 1 over a wide range of pH values. In his view, given the amphetamine level in Moore's urine, one might extrapolate that his methamphetamine level was 27,000 nanograms per milliliter, a borderline lethal level, according to Disposition of Toxic Drugs and Chemicals in Man. Martinez also testified that there is faster excretion of methamphetamine and amphetamine in acid urine. Defendant's urine, with a pH of 6, was more acidic than urine with a neutral pH of 7.

Martinez then discussed the effects of methamphetamine on the human body, particularly on the nervous system. He opined that methamphetamine in the level shown by Moore's urine would cause delusions, hallucinations, and bizarre, violent behavior.

On cross-examination, Martinez was asked to read passages from his reference authorities. One stated that "it is difficult if not impossible to answer questions regarding dosage, mode of intake, degree of impairment, or the frequency of use [from urinary excretion of a drug]." Another of the authorities indicated that there was "no direct relationship" between "impairment and the urine concentration of a drug"; that "identification of a drug in urine, therefore, only indicates that the suspect has been exposed to that drug"; and "that there is no well-established correlation between blood concentration and performance impairment for any drug other than alcohol."

The district judge concluded that Martinez' methodology comported with the *Frye* standard; however, the testimony was inadmissible because there was no evidence that Moore had been using drugs on the night of the crimes. On the contrary, Sparks testified she did not think he had been, and police testified that their conversations with Moore both before and after the shootings were coherent. The district judge said, "I'll find as a matter of law that I do not have sufficient evidence to give a voluntary intoxication instruction."

The district court also declined to give a voluntary manslaughter instruction based on imperfect self-defense, *i.e.*, that a person who harbors an honest but unreasonable belief in the necessity of ex-

erting deadly force in self-defense is guilty of voluntary manslaughter rather than capital murder. The judge said:

"I don't have any testimony that he had an honest belief. I have testimony that, after the incident, he did tell Detective Walton that he was acting in self-defense. But I find you can't have an honest belief under these circumstances that you're acting in self-defense. He knew—he knew why they were there, he knew what was going to happen, and he's not entitled to that instruction. There was no honest belief of self-defense."

The jury found Moore guilty as charged. When, after a separate sentencing proceeding, the jury was unable to reach a unanimous verdict on imposition of the death penalty, the judge sentenced Moore to life imprisonment without parole, plus 1,094 months.

### Instruction on Voluntary Manslaughter Based on Imperfect Self-Defense

Moore argues that the district judge's refusal to give the lesser included offense of voluntary manslaughter instruction based on imperfect self-defense is reversible. This error, he asserts, prevented the jury from accepting his theory of the case, *i.e.*, that he had an honest but unreasonable belief that he would be shot to death by police if they entered his home or he emerged from it. A criminal defendant is constitutionally entitled to present his or her theory of defense. See *State v. Baker*, 281 Kan. 997, Syl. ¶¶ 2, 4, 7, 135 P.3d 1098 (2006). And a district judge has a duty to instruct the jury on any lesser included offense established by the evidence, regardless if that evidence is weak or inconclusive. There is, however, no duty to instruct on a lesser included offense if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented. See *State v. White*, 284 Kan. 333, 347, 161 P.3d 208 (2007) (quoting *State v. Boyd*, 281 Kan. 70, 93, 127 P.3d 998 [2006]; *State v. Drennan*, 278 Kan. 704, 712-13, 101 P.3d 1218 [2004]); *State v. Hunter*, 241 Kan. 629, 646, 740 P.2d 559 (1987). When reviewing a district judge's refusal to give a requested instruction, this court must view the evidence in the light most favorable to the requesting party. *State v. Saleem*, 267 Kan. 100, 113, 977 P.2d 921 (1999).

Defendant was charged with capital murder and attempted capital murder under K.S.A. 21-3439(a)(5), which prohibits the "intentional and premeditated killing of a law enforcement officer, as defined in K.S.A. 21-3110 and amendments thereto." The parties stipulated to the victims' status as law enforcement officers. K.S.A. 21-3403 defines voluntary manslaughter as "the intentional killing of a human being committed: . . . (b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211 . . . ." In turn, K.S.A. 21-3211 provides: "A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such force is necessary to defend such person or a third person against such other's imminent use of unlawful force." See *White*, 284 Kan. at 347-48; compare K.S.A. 21-3211 (Furse 1995). Thus voluntary manslaughter based on imperfect self-defense is not a defense to criminal liability; it is a lesser degree of homicide. *State v. Carter*, 284 Kan. 312, 326, 160 P.3d 457 (2007).

Moore did not testify, but he asserts that adequate evidence of his honest belief in the necessity of exerting deadly force came in through the testimony of Walton, who admitted Moore told him repeatedly that he was "defending himself," and through Taylor, who testified Moore believed he was going to be shot by police. Sparks also testified that Moore stated he believed he would die.

We are not persuaded by Moore's argument. In order for him to be convicted of voluntary manslaughter based on imperfect self-defense, the jury would have had to conclude the circumstances could warrant an honest belief that the uniformed officers who entered Moore's home were aggressors threatening imminent use of "unlawful" force. See *White*, 284 Kan. at 347-48; K.S.A. 21-3211 (Furse 1995). Moore's jury could not reasonably do so on the record before us.

Two analogous decisions on the necessity of ordinary self-defense instructions are instructive.

In the first, *State v. Tyler*, 251 Kan. 616, 840 P.2d 413 (1992), defendant St. John Tyler requested a self-defense instruction; Tyler was prosecuted for shooting a uniformed police detective who assisted in a warrant-supported raid on Tyler's alleged crack house.

The district judge ruled that "a law enforcement officer executing a validly issued search warrant" could not, as a matter of law, "be an 'aggressor' within the meaning of K.S.A. 21-3211." 251 Kan. at 626; see K.S.A. 21-3211 (Furse 1995).

On appeal, this court upheld the outcome in the district court but held that its legal ruling was overbroad. We held that a self-defense instruction could be appropriate when an unidentifiable law enforcement officer used force to execute a warrant, if a reasonable person believed the force was justified to repel an unlawful aggressor. *Tyler*, 251 Kan. at 626. However, Tyler's circumstances fell outside this rule. Although the detective involved had raised his gun, there was no indication that he was about to use "unlawful" force. Rather, the detective was dressed in clothing identifying him as deputy sheriff and several occupants of the house heard the officers involved in the raid identify themselves as they entered. Tyler had not attempted to ascertain the detective's identity, and Tyler admitted that he knew his drug operation might be raided and that officers might enter quickly in such an event. With this evidence before the jury, Tyler's testimony that he did not know the detective was a police officer and certain occupants' testimonies that they had not heard the officers identify themselves did not justify a self-defense instruction. 251 Kan. at 626-27.

In *State v. Lutter*, 27 Kan. App. 2d 858, 860, 10 P.3d 16, *rev. denied* 270 Kan. 902 (2000), a panel of our Court of Appeals applied *Tyler* to hold that the district judge did not err by refusing to give a self-defense instruction. In *Lutter*, the only evidence arguably supporting the instruction was the defendant's testimony that he thought the officer, Butler County Sheriff's Deputy Jeremy Train, was going to kill him. The defendant, Michael Lutter, had run away after officers responded to a report of a stranded vehicle in a cemetery. The Court of Appeals panel wrote:

"Although Train had his gun out, no evidence was presented that indicates that he was about to use unlawful force. Lutter knew that Train was a uniformed sheriff's deputy. He was running away when Train gave chase and told him that he was under arrest. Though Lutter claims he feared for his life and shot first to defend himself against perceived imminent, unlawful aggression, his testimony discloses otherwise. Lutter admits he shot to scare the deputy so that he could

escape. In addition, under these circumstances, no reasonable person in Lutter's circumstances would believe it necessary to shoot Deputy Train to defend himself from imminent use of unlawful force." *Lutter*, 27 Kan. App. 2d at 861.

As in *Tyler* and *Lutter*, the evidence in this case did not merit the giving of any kind of self-defense instruction. There is no question that Moore appreciated that the persons at his door were law enforcement officers, that he appreciated the reasons they had gathered outside his home and desired to enter it, and that Sparks was a hostage until virtually the same moment that the police came through the door. Moore fired at the officers in spite of his undeniable knowledge of their identity and purpose. Under these circumstances, Moore simply could not have harbored an honest but unreasonable belief that the deadly force was necessary; and we have no hesitation in upholding the district judge's decision to deny a voluntary manslaughter instruction based on imperfect self-defense.

This decision eliminates any need to address an alternative argument made by the State, *i.e.*, that the "skip rule" should apply to excuse any error in refusing the voluntary manslaughter instruction. See *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004).

### Instruction on Voluntary Intoxication

K.S.A. 21-3208(2) provides:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

The capital murder and attempted capital murders with which Moore was charged include intent and premeditation as elements. See K.S.A. 21-3439(a)(5). As with Moore's first issue on the voluntary manslaughter instruction, we must address the adequacy of the evidence to support his request to the district judge for a voluntary intoxication instruction. See *Saleem*, 267 Kan. at 113.

The defense argues that Moore's residence was littered with empty and full beer cans and liquor bottles; that Moore had a history of alcohol and drug abuse and his behavior became mean, violent, and paranoid when he was under the influence; and that

Moore unquestionably behaved in a mean, violent, and paranoid manner on the night of the crimes. This is circumstantial evidence that he was under the influence on April 8 and 9. The State points out that neither H.A. nor Sparks, who were in Moore's presence at the time, were aware of him drinking or using drugs. And neither Bayless nor Walton, with whom Moore spoke for several hours, observed any sign of impairment from alcohol or drugs. In fact, Moore clearly understood what was going on and communicated coherently.

Even without the testimony of Moore's toxicology expert, Martinez, or admission of the urine screening report on which it relied, which we discuss below, we hold that Moore was entitled to a voluntary intoxication instruction. It is clear from the record before us that the district judge weighed the evidence supporting and undercutting the instruction rather than simply determining whether the minimum evidence necessary to require the instruction was present. See *Baker*, 281 Kan. 997, Syl. ¶¶ 2, 4. The circumstantial evidence of Moore's voluntary intoxication at the time of the crimes may not have been strong, but it was adequate to support an instruction.

However, given the enormous weight of the evidence against Moore, we hold that the judge's error in refusing to give a voluntary intoxication instruction error was harmless. This is true regardless of whether we view the error as one of constitutional magnitude, infringing on Moore's right to present his theory of defense, or as nonconstitutional trial error. Compare *State v. Atkinson*, 276 Kan. 920, 925, 80 P.3d 1143 (2003) (constitutional error harmless if appellate court "willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial"), and K.S.A. 60-261 (reversal not required unless refusal to grant it "inconsistent with substantial justice," error affected party's "substantial rights"); see *State v. Jones*, 277 Kan. 413, 423, 85 P.3d 1226 (2004). Moore made repeated and cogent, though tragically misguided, statements about his expectations for the evening, about a "bloodbath," and about his demise in a "blaze of glory." Those expectations were, at least in part, realized.

## Admission of Toxicology Expert's Testimony

Moore also argues that the district judge erred in excluding Martinez' proffered testimony. Moore asserts that this claim of error should be reviewed de novo. The State maintains that the appropriate standard by which to review the admission or exclusion of such evidence is abuse of discretion.

Traditionally, this court has stated that " '[t]he admission of expert testimony lies within the sound discretion of the trial court. Its decision will not be overturned absent an abuse of such discretion. One who asserts an abuse of discretion bears the burden of showing such abuse.' " *State v. Brice*, 276 Kan. 758, 775, 80 P.3d 1113 (2003) (quoting *Irvin v. Smith*, 272 Kan. 112, 125, 31 P.3d 934 [2001]). However, little turns on whether the court " 'label[s] review of this particular question abuse of discretion or de novo, for an abuse-of-discretion standard does not mean a mistake of law is beyond appellate correction. A district court by definition abuses its discretion when it makes an error of law. . . . The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.' " *State v. White*, 279 Kan. 326, 332, 109 P.3d 1199 (2005) (quoting *Koon v. United States*, 518 U.S. 81, 100, 135 L. Ed. 2d 392, 116 S. Ct. 2035 [1996]). This court has recently modified the standard of review on such questions to reflect the actual analysis it applies: " ' "[E]videntiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question." ' " *State v. Morton*, 283 Kan. 464, 473, 153 P.3d 532 (2007) (quoting *State v. Oliver*, 280 Kan. 681, 693, 124 P.3d 493 [2005]).

Here, the appropriate standard for review should be tied to the basis for the district judge's decision; but this is problematic, because the judge never explicitly ruled that the testimony could not be admitted. In fact, the district judge ruled in favor of the defense on the *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), issue, *i.e.*, the necessary scientific recognition and reliability of Martinez' methodology. Compare *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 456, 14 P.3d 1170 (2000) (district judge failed to

apply *Frye* standard correctly). Any further decision the judge may have made on whether an appropriate foundation had been laid for the opinion and whether the opinion itself was relevant and helpful to the jury were short-circuited by ruling that no voluntary intoxication instruction would be given and abandonment of the defense attempt to use Martinez to support Moore's theory of the case.

The unusual order of events before the district judge is critical to our understanding. The district judge first heard the proffer of Martinez' testimony outside the presence of the jury. Apparently considering that proffer, among other evidence, he then ruled against the defense on its requests for instructions on voluntary manslaughter and voluntary intoxication. We regard the first decision on the voluntary manslaughter instruction as correct; the second decision on the voluntary intoxication instruction was incorrect. The court then reconvened in the presence of the jury, and the defense rested. At this stage, we can only attempt to reconstruct the reasoning behind this choice. But, without a voluntary intoxication instruction, there was nothing that Martinez could say that would be helpful to the jury or exculpatory for Moore.

In circumstances other than those before us, we might find this order of events and the interrelationship between Moore's appellate arguments on the voluntary intoxication instruction and on Martinez' testimony troubling. Here, we do not. Our careful examination of Martinez' proffer convinces us that there was nothing he could have contributed to the jury's understanding of the case, even if the jury had been given a voluntary intoxication instruction.

To begin with, the report of the urine screening performed shortly after Moore was arrested was not admitted into evidence. No foundation for it was laid, and no hearsay exception was established. This report was the sole basis for Martinez' expert opinion, and Kansas law requires an expert's opinion to be supported by admitted evidence. See *State v. Gonzalez*, 282 Kan. 73, 80-88, 145 P.3d 18 (2006).

Second, even if a voluntary intoxication instruction had been given, Martinez admitted that he needed more information to opine on Moore's actual impairment at the time of the crimes.

Although his report stated that "habitual use" of the "massive levels of methamphetamine" that would produce the values in Moore's screening report "are known to result in toxic psychosis characterized by paranoia, delusion, hallucinations, bizarre and violent behavior," he was unable to testify about the timing of Moore's ingestion of drugs or the effect the drugs actually had on him in particular.

We also see some similarity between this case and *State v. Lawrence*, 281 Kan. 1081, 1087-89, 135 P.3d 1211 (2006), in which we ruled that a treating physician could not testify about the effect that the risk of being injured or killed in a shooting may have on African-American men. We ruled that such general testimony could not be employed in that case to support an argument that a particular African-American man, defendant Kelly Jay Lawrence, possessed an honest belief in certain circumstances that he must use deadly force in self-defense. See *Lawrence*, 281 Kan. at 1088-89. As we recognized in *Lawrence*, vague or speculative testimony about what may be true about certain members of a group on various occasions is not the same as testimony about what was true about a particular member of that group on a specified occasion.

Finally, we observe that Moore did not object to the order of the proceedings before, or the order of the decisions made by, the district judge. And his arguments on appeal rest on the presumption that all necessary evidence had been considered by the judge when he made his rulings on this and other issues.

Under what we are certain will be the unusual circumstances of this case, we are confident there was no error in the district judge's treatment of Martinez' testimony, regardless of whether we apply the de novo standard of review urged by the defense or the abuse of discretion standard advocated by the State.

## Conclusion

In summary, there was no error in the district judge's refusal to instruct on voluntary manslaughter based on imperfect self-defense. Although the district judge's refusal to instruct on voluntary intoxication was error, that error was harmless. There was no error

in the district judge's treatment of Moore's toxicology expert's testimony.

The judgment of the district court is therefore affirmed.