(227 P.3d 11)
No. 100,361

STATE OF KANSAS, *Appellee*, v. LARRY L. STINSON, *Appellant*.

Opinion filed March 26, 2010.

*Rick Kittel,* of Kansas Appellate Defender Office, for appellant.

*Robbin L. Wasson,* assistant district attorney, *Jerome A. Gorman,* district attorney, and *Steve Six,* attorney general, for appellee.

Before MCANANY, P.J., GREEN and MALONE, JJ.

GREEN, J.: Larry Stinson appeals from his jury trial convictions for one count each of aggravated battery and aggravated robbery against Daniel Harris. Stinson first argues that the trial court committed reversible error when it would not allow defense counsel to impeach Harris with his prior inconsistent statements and repeatedly refused to allow defense counsel to make a proffer of the excluded statements. Stinson's argument has merit. The trial court applied an erroneous legal standard in determining that Harris could not be impeached with his prior inconsistent statements and in further determining that Harris' memory could not be refreshed by his prior statements. As a result, the trial court's decision to exclude the statements constituted an abuse of discretion. Moreover, the trial court committed error when it refused to allow Stinson's attorney to complete his proffer of the excluded statements.

Under the facts presented, the key to this case was the credibility of Harris, and because Stinson was denied the opportunity to fully and adequately test Harris' credibility, we determine that the trial court's error in excluding Harris' prior inconsistent statements constituted reversible error. Accordingly, we reverse and remand for a new trial. Because we are reversing and remanding for a new trial, Stinson's remaining argument regarding his ineffective assistance of counsel claims is moot.

The underlying events in this case occurred on the evening of July 29, 2006, at the home of Harris. Stinson and Harris had known each other for at least 10 years and had gone to junior high and high school together. More recent to the incident, Stinson, who was part of a rap group, would use Harris' recording equipment at Harris' home to record Stinson's music.

Stinson had lived with Harris at Harris' home during May, June, and July 2006. According to Stinson, Harris' house was considered a party house, and Stinson and Harris sold drugs out of it. Nevertheless, around the middle of July, Stinson moved out of Harris' house at Harris' request.

Harris testified that on the evening of July 29, 2006, Stinson called and asked if he could come by the house. Harris' friend, Kyle Titus, was at Harris' house when Stinson arrived. Harris testified that after Titus let Stinson in, Stinson came into Harris' bedroom and started talking to him. Harris then heard Stinson talking on his two-way radio and telling someone else to come inside.

According to Harris, Marcus Moon and another man entered his house and came into his bedroom. Harris had gone to school with Moon and knew him as one of Stinson's friends, but he did not know the other man. Harris testified that Stinson pointed a gun at his face and ordered him to give Stinson Harris' money and marijuana. Harris further testified that Moon also pointed a gun at his face and that the third man stood in the doorway.

Harris testified that he gave Stinson approximately $600 in cash and marijuana. Moreover, Harris testified that Stinson took Harris' cell phone from his dresser. When Harris asked what was going on, Moon told him to shut his mouth and pistol-whipped him in the face. According to Harris, Stinson attacked him, and then Stinson and Moon led him around the house asking where items were located. Harris testified that although he tried to fight back, he was unable to do so because Stinson was choking him. Harris further testified that when he told the men that he had already given them everything, Stinson and Moon beat him more. Harris testified that during the incident, Stinson struck him with his fist and gun and he was pistol-whipped on his torso.

When the men had finished striking Harris, they got into their car and drove away from Harris' house. Harris later discovered that a gold chain, some rings, and a pistol were missing from his house.

When questioned at trial about Titus' location in the house during the incident, Harris testified that initially Titus was in Harris' bedroom in front of Harris' closet when the three men were in Harris' bedroom. Harris further testified, however, that he did not know where Titus was while the men were beating him and that he did not see the men strike Titus.

After the men left Harris' house, Harris and Titus went to a neighbor's house and called 911. Based on the injuries he received that night, Harris was taken to the hospital. The emergency room treating doctor testified that Harris had sustained multiple bruising, abrasions, swelling on his face, and lacerations to his lip and nose, all of which were consistent with blunt force trauma to the face. A CT scan of Harris' face revealed that Harris had several facial fractures of the boney structures of his eye and sinus. Further, Harris had a significant mark and bruising on his lower abdomen and some abrasions and bruising on his shoulders.

The State charged Stinson with one count of aggravated robbery in violation of K.S.A. 21-3427 for the taking of money and a telephone from Harris; one count of aggravated battery to Harris in violation of K.S.A. 21-3414; and one count of aggravated robbery in violation of K.S.A. 21-3427 for the taking of a telephone from Titus.

Titus' testimony at trial about the specific details surrounding the July 29, 2006, incident differed somewhat from Harris' testimony. Titus testified that when the three men came into Harris' bedroom, Moon put a gun to the back of Titus' head and told him to look inside the bedroom closet. Titus further testified that he thought that Stinson had a gun, but he was not completely sure of that fact. According to Titus, the men took Harris out to the hallway where they beat him. Titus testified that although he was facing the closet, he could still look to the left and see what was going on between Harris and the three men. According to Titus, all three of the men were hitting Harris.

While the men were beating Harris, Titus attempted to leave the house. Titus testified that Moon stopped him from leaving and then Moon punched him and pistol-whipped him. Moon made Titus go back and face the bedroom closet. Titus testified that while he was attempting to leave, he saw Stinson "beat on" Harris. According to Titus, Harris was not really fighting back and was screaming in pain. Titus testified that the whole incident lasted about 5 minutes.

Titus testified that one of the men took his cell phone during the incident, but he was unsure which of the men took it. According to Titus, the man took it from him when he reached in his pocket and attempted to dial 911. Titus testified that no other property was taken from him.

During his testimony at trial, Stinson admitted that he had previously lied to his mother and told her that he was not at Harris' house when the July 29, 2006, incident occurred and that he had an alibi for that night.

Nevertheless, Stinson testified that he had gone to Harris' house with Moon and another man on the evening of July 29, 2006. According to Stinson, he had called Harris that evening and had arranged to purchase marijuana from Harris at Harris' home. Stinson testified that upon arriving at Harris' home, he, Moon, and the other man all went to the front door together and were let inside by Titus. Stinson walked to the back room and spoke with Harris, while Moon and the other man waited in the front room.

Stinson testified that after he bought the marijuana from Harris, Harris confronted him about how he was able to buy marijuana when he still owed Harris $700. Stinson told Harris that he would eventually pay back the money he owed and that he just wanted to get a few of his items that were still at Harris' home. Harris, however, told Stinson that he would not be able to get all of his items, including his music CD's, until Stinson paid Harris the money he owed.

According to Stinson, as the argument between he and Harris escalated, Stinson tried to leave the room but Harris put his arm up and put his hands in Stinson's face. Stinson testified that as he was trying to move Harris' hand so that he could leave the room,

Harris swung at him and also tried to grab for him. At that point, Stinson and Harris began fighting.

Stinson testified that as he and Harris were fighting, Moon and the other man came into the room and joined the fighting. Stinson and Harris fell to the ground, and Stinson pushed Harris off of him and kicked his feet. According to Stinson, Moon and the other man jumped on top of Harris and "scuffled" with him while Stinson went out to the living room and grabbed his CD's. After Stinson retrieved his CD's, he told Moon and the other man that they needed to leave and to get off of Harris. Stinson testified that Moon and the other man kicked Harris a couple of times and then they all left.

According to Stinson, no one had any guns at Harris' house, and no one took any cell phones or money from anyone there. Moreover, Stinson testified that neither he nor Moon and the other man received any injuries from the fight with Harris.

According to Stinson, when Moon and the other man came into the back room and starting fighting with Harris, Titus came in the back room also. While they were fighting, however, Stinson did not see Titus. At the end of the incident, Stinson asked where Titus was, and Moon told him that Titus was in another bedroom. Stinson testified that he never saw Titus being hit.

According to Stinson, he had seen or talked with Harris by phone several times since the July 29, 2006, incident. Stinson testified that shortly after the incident, he had met Harris to purchase some marijuana and then had dropped Harris off at his house, which was right across the street from Stinson's mother's house.

The jury found Stinson guilty of the charges of aggravated robbery of Harris and aggravated battery of Harris. The jury acquitted Stinson of the charge of aggravated robbery of Titus.

After trial, Stinson filed a pro se request for a new trial. Stinson raised numerous arguments as to why he should be granted a new trial, which included several claims of ineffective assistance of counsel. After holding a nonevidentiary hearing, the trial court denied Stinson's motion for a new trial. The trial court then sentenced Stinson to concurrent sentences of 77 months in prison on his

aggravated robbery conviction and 41 months in prison on his aggravated battery conviction.

## I. *Exclusion of Harris' Prior Inconsistent Statements*

First, Stinson argues that the trial court violated his statutory and constitutional rights and committed reversible error when it refused to allow his attorney to impeach Harris with his prior inconsistent statements.

When reviewing a trial court's decision concerning the admission of evidence, an appellate court first determines whether the evidence is relevant. All relevant evidence is admissible unless prohibited by statute. K.S.A. 60-407(b); *State v. Riojas*, 288 Kan. 379, 382, 204 P.3d 578 (2009). Evidence is relevant if it has any "tendency in reason to prove any material fact." K.S.A. 60-401(b).

Once relevance is established, the trial court must then apply the statutory rules governing the admission and exclusion of evidence. These rules are applied either as a matter of law or in the exercise of the trial court's discretion, depending on the rule in question. Therefore, the standard of review that is applicable on appeal will depend upon which rule the court applied to determine the admissibility of the evidence at issue. *Riojas*, 288 Kan. at 383.

Stinson points out that during the trial, his attorney attempted to introduce Harris' prior inconsistent statements which Harris had made either in preliminary hearing testimony or in his written statement to the police.

### A. *Prior Inconsistent Statement Regarding Titus' Location During Incident*

Specifically, after Harris testified at trial that Titus was in the room with him and the other men when the incident began, Stinson's attorney questioned Harris about his prior testimony at Moon's preliminary hearing where he stated that Titus was in the closet in another bedroom:

"[Defense counsel:] Now, do you remember testifying in the preliminary hearing with Marcus Moon that you said that Kyle [Titus] was in the other bedroom in the closet? Do you remember testifying to that?

"[Harris:] I don't recall that, no.

"[Defense counsel:] Okay. If you were to listen to a recording of that, would it help refresh your memory?"

At that point, the trial judge interrupted defense counsel and would not allow him to use Harris' prior sworn statements to impeach Harris or to refresh Harris' memory:

"[Trial judge:] May I see counsel for a second? (The following proceedings were had at the bench by Court and counsel out of the hearing of the jury:)

"[Trial judge:] The only time you can get him to listen to it is if he denies making the statement. If he says he can't recall, you can't use it to impeach him because he's not denying the statement.

"[Defense counsel:] So I can ask him directly is he denying any—that he ever made that statement?

"[Trial judge:] No, sir. You've already asked him the question and he said, I can't recall. I don't recall saying that. He's not saying, no, I didn't say that.

"[Defense counsel:] I'm trying to impeach him. I asked if he would refresh his memory. I'm not gonna play it to impeach him.

"[Trial judge:] I know, but the reason that you want him to read it is so you can ask him the question. But you can't ask him the question unless he denies making the statement.

"[Defense counsel:] Well, I think we can—I'm gonna point it out like this 'cause every police officer we ever have testify in this case for the State, they could never really remember everything. And the police we always ask, would it help you refresh your memory if you looked at your statement, and we always allow them. This is the same thing as we do with a police officer. Yes, it is.

"[Trial judge:] Sir, I'm not gonna argue with you. I'm making my ruling.

"[Defense counsel:] I'm trying to make a record for appeal. This is a critical issue because he did make contrary statements. It is contradiction when he says, I can't remember, when he did, in fact, testify that Kyle was in this other room—as a proffer—

"[Trial judge:] Okay.

"[Defense counsel:] —that he was never in the bedroom with him. He was in another room.

"[Trial judge:] I understand.

"[Defense counsel:] He testified that he didn't—he testified he didn't know he was hit, but, in fact, he testified in the preliminary hearing that he heard he was hit. This is all contradictory. So when you're denying, you're, in fact, contradicting your prior testimony that was only a few months ago.

"[Trial judge:] No. When you say you can't recall is not denying making the statement. That's my ruling. You may step back."

## B. *Prior Inconsistent Statement Regarding Titus Being Struck*

Next, after Harris testified that he had not heard Titus get struck during the incident, Stinson's attorney asked Harris if he denied testifying previously that he had heard Titus get struck:

"[Defense counsel:] You said you didn't see [Titus] struck, correct?

"[Harris:] Yes.

"[Defense counsel:] Did you hear him get struck?

"[Harris:] No, I didn't. At the time, no, I didn't hear nothing.

"[Defense counsel:] Okay. Do you deny saying in a previous testimony that you heard him get struck?

"[Harris:] I don't remember.

"[Defense counsel:] Would it—would it help refresh your memory since you don't remember—"

At that point, the prosecutor objected, which began a lengthy dialogue between the trial judge, defense counsel, and the prosecutor concerning the exclusion of such evidence:

"[Prosecutor:] Objection, Your Honor, same basis we discussed.

"[Defense counsel:] No. This is different.

"[Trial judge:] Sir?

"[Defense counsel:] Can we approach?

"[Trial judge:] Yes, sir, you can. (The following proceedings were had at the bench by Court and counsel out of the hearing of the jury:)

"[Defense counsel:] This is a different situation. I asked him does he remember and if he's he said he's not denying he said it. He—this is he doesn't remember. Well, this is the exact instance where you refresh somebody's memory with a record. And we can do that.

. . . .

"[Prosecutor:] You asked him, do you deny saying it. He said, I don't remember. Not the same thing.

"[Trial judge:] And that's—

"[Defense counsel:] Well, Judge, you're saying—

"[Trial judge:] No. You've already made your record. You're trying to use apples and oranges, Mr. Lamb, and I don't agree with you and I'm making my ruling against you. I'm sustaining her objection and obviously the record reflects all of the arguments you've previously made on this particular issue.

"[Defense counsel:] Except on this one. I want to make a proffer because he did testify that he heard it.

"[Trial judge:] It doesn't make any difference.

"[Defense counsel:] It does, Judge.

"[Trial judge:] No. We disagree on that. If he denied making the statement, then you could refresh his recollection and impeach him.

. . . .

"[Trial judge:] I've made my ruling and it's basically the same ruling that I made the last time for the same reason. He didn't deny making the statement. He said he can't remember. The objection is sustained. Let's move on."

### C. *Harris' Prior Inconsistent Statements Regarding His Employment*

A short time later during Harris' cross-examination, defense counsel attempted to introduce Harris' prior inconsistent statement that he was not working when the incident occurred in this case:

"[Defense counsel:] You didn't have a job at the time. You did tell the police that, didn't you?

"[Harris:] I was working with my dad remodeling. He owns his own business.

"[Defense counsel:] You're saying you—you told the police that you were working with your dad?

"[Harris:] No. I didn't say that. I'm saying I was working with my dad.

"[Defense counsel:] Now, I'm gonna go back to the statement that you gave on August 2nd to Detective Howard. In this statement, would you agree that on August 2nd, he asked you, Daniel, where are you employed, and you answered, I'm not employed. Do you recall that?

"[Harris:] I don't recall, but I was working with my father.

"[Defense counsel:] May I approach to—

"[Defense counsel:] Would it help you refresh your memory if you read your statement?'"

At that point, the prosecutor objected on the basis that Harris had not denied making his previous statement:

"[Prosecutor:] Your Honor, objection. He's not denying that he made the statement. He's saying he doesn't recall.

"[Defense counsel:] Then I'm gonna ask to introduce this as a prior inconsistent statement.

"[Trial judge:] No, sir. You can't use that particular rule in that fashion. He's not denying making the statement. He's saying that, at the time, he was working with his father. You asked him, do you remember telling the police—

"[Defense counsel:] May I approach?

"[Trial judge:]—that. He said, I don't recall.

"[Defense counsel:] May I approach?

"[Trial judge:] Not if it's going to be to reargue the same issue. If you have something new, I'll be happy to listen to you, sir. (The following proceedings were had at the bench by Court and counsel out of the hearing of the jury:)

"[Defense counsel:] I'm gonna need a break here, 'cause I'm gonna have to get a subpoena issued to get Detective Howard over here to testify to this.

"[Trial judge:] I'm not giving you a break for that. You can't use the rules of evidence in that fashion, Mr. Lamb. He's not denying making the statement. He said, I don't recall making that statement. That's not a prior inconsistent statement and you cannot use it to impeach him. That is my ruling.

"[Defense counsel:] Judge—

"[Trial judge:] I believe that is the law. You may step back now.

"[Defense counsel:] This is—I'm gonna make a proffer. I'm making a proffer for the record that the prior—

"[Trial judge:] I tell you when you get to make a proffer or not.

"[Defense counsel:] Judge—

"[Trial judge:] And this is the same issue that we have talked about three times prior at the bench and now in court. I disagree with you. You disagree with me. The record is clear. But that is my ruling. Now, stand back."

### D. *Refreshing of Witness' Recollection*

The State concedes that Stinson should have been permitted to have Harris listen to the recording of the preliminary hearing, outside of the presence of the jury, in order to refresh his recollection.

Regarding the use of memoranda to refresh the memory of a witness, the rule is well established that "[a] witness while testifying, or prior thereto, may refresh his recollection by reference to any memoranda relating to the subject matter, provided he then has an independent recollection of the subject matter." Barbara, Kansas Law and Practice, Lawyer's Guide to Kansas Evidence § 9.13, p. 309 (5th ed. 2007); see *State v. Scott*, 199 Kan. 203, 206, 428 P.2d 458 (1967). The weight and force of the testimony is for the trier of fact to determine. 199 Kan. at 206; see *State v. Cook*, 180 Kan. 648, 650-51, 305 P.2d 851 (1957). Moreover, our Supreme Court has held that "it is not improper for a prosecutor or any other attorney to allow witnesses to refresh memory by reading their prior sworn testimony." *State v. Humphrey*, 252 Kan. 6, 29, 845 P.2d 592 (1992).

Here, when Harris could not remember his previous statement to the police and his specific testimony at the preliminary hearing, it was appropriate for defense counsel to utilize Harris' prior statement and his prior testimony in an attempt to refresh his memory. Normally, it is within the trial court's discretion to determine

whether memoranda or other items may be used to refresh a witness' recollection. *State v. Kelly*, 19 Kan. App. 2d 625, 627, 874 P.2d 1208 (1994). In this case, however, the trial court erroneously determined that Harris had to deny making the statement before the prior statement could be introduced to refresh his recollection. Because the trial court's determination to not allow defense counsel to refresh Harris' memory with his prior sworn statements went outside the framework of the proper legal standard, its decision constituted an abuse of discretion. See *State v. Moore*, 287 Kan. 121, 135, 194 P.3d 18 (2008) (trial court abuses discretion when decision guided by erroneous legal conclusions).

E. *Admission of Prior Inconsistent Statements under K.S.A. 60-420 and K.S.A. 60-422*

One of the most important areas of the law of evidence relates to impeaching witnesses. "To impeach a witness means to call into question the veracity of the witness by means of evidence offered for that purpose, or by showing that the witness is unworthy of belief." *State v. Barnes*, 164 Kan. 424, 426, 190 P.2d 193 (1948). Moreover, one of the most effective means of attacking the credibility of witnesses is by proving that the witnesses on a previous occasion have made statements inconsistent with their present testimony.

Here, Stinson maintains that Harris' previous statements in his preliminary hearing testimony and in his written statement to police would be admissible as prior inconsistent statements.

In at least one of the instances where he was attempting to introduce Harris' previous statements to refresh Harris' recollection, Stinson also requested to introduce them as prior inconsistent statements. Further, the trial court treated all of Stinson's three attempts to introduce Harris' previous statements as if he was trying to introduce prior inconsistent statements for impeachment purposes. Nevertheless, the trial court determined that because Harris had not denied making his previous statements but had only been unable to recall making them, Stinson could not introduce the statements for impeachment purposes.

The trial court's determination is not in accord with the statutory and case law regarding the admissibility of prior inconsistent statements to impeach a witness who testifies at trial.

K.S.A. 60-420 states the general rule for admissibility of impeachment evidence:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

Both K.S.A. 60-421 and K.S.A. 60-422 limit the admissibility of evidence affecting credibility under K.S.A. 60-420. Specifically, K.S.A. 60-421 limits the admissibility of evidence pertaining to the defendant's conviction of a crime. K.S.A. 60-422 further limits the admissibility of evidence, including prior inconsistent statements, as follows:

"As affecting the credibility of a witness (a) in examining the witness as to a statement made by him or her in writing inconsistent with any part of his or her testimony it shall not be necessary to show or read to the witness any part of the writing provided that if the judge deems it feasible the time and place of the writing and the name of the person addressed, if any, shall be indicated to the witness; (b) extrinsic evidence of prior contradictory statements, whether oral or written, made by the witness, may in the discretion of the judge be excluded unless the witness was so examined while testifying as to give him or her an opportunity to identify, explain or deny the statement; (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

None of the limitations under K.S.A. 60-421 or K.S.A. 60-422 would apply to the circumstances present in this case. Harris' prior statements did not relate to a criminal conviction and, therefore, were not limited by K.S.A. 60-421. Moreover, Harris was on the stand testifying when Stinson attempted to question him about his prior inconsistent statements, which Harris claimed a lack of recollection of the statements. Because Harris had the opportunity to identify, explain, or deny the statements, an adequate foundation was established for introduction of the prior statements under K.S.A. 60-422(a) and (b). See *State v. Murrell*, 224 Kan. 689, 693, 585 P.2d 1017 (1978); see also *State v. Gauger*, 200 Kan. 515, 520,

438 P.2d 455 (1968) (If the witness states that he or she does not recall whether he or she made the former statement and has been given an opportunity to identify, explain, or deny the statement, the foundation is sufficient.).

When Stinson attempted to question Harris about his previous inconsistent statements, the trial court improperly excluded such statements on the basis that Harris did not recall making them. Such a rule is contradictory to statutory and case law. Our Supreme Court has stated that "[w]here an impeaching statement is written, and the witness, although admitting that he gave a statement, *cannot remember the contents thereof* or denies the same, the statement itself or at least the impeaching portion thereof should be admitted into evidence." *State v. Schlicher*, 230 Kan. 482, Syl. ¶ 4, 639 P.2d 467 (1982). See *State v. Ward*, 31 Kan. App. 2d 284, 291-92, 64 P.3d 972, *rev. denied* 276 Kan. 974 (2003) (If a witness denies an impeaching fact, or does not recall it, then extrinsic evidence is to be utilized for impeachment.); Barbara, Kansas Law and Practice, Lawyers Guide to Kansas Evidence § 3.1, p. 63. A witness may also be impeached with prior sworn testimony. See *State v. Worth*, 217 Kan. 393, 395, 537 P.2d 191 (1975), *cert. denied* 423 U.S. 1057 (1976).

Moreover, within the discretion of the court, a cross-examiner may inquire into collateral matters when the inquiry is not barred by any specific rule. *State v. Nix*, 215 Kan. 880, 884, 529 P.2d 147 (1974) (allowed inquiry regarding admission of witness to a mental health clinic). In addition, there must be a showing of abuse of discretion or prejudice to the appealing party before reversal is justified. 215 Kan. at 884; see also *State v. Nixon*, 223 Kan. 788, 792-94, 576 P.2d 691 (1978) (The court held it was error to preclude the defendant from presenting evidence on a collateral matter in an attempt to show that the prosecuting witness had been untruthful in her testimony.).

Because a defendant in a criminal case has a right to confront the State's witnesses under the Sixth Amendment to the United States Constitution, the defendant must be given an effective opportunity to cross-examine those witnesses. See *United States v. Owens*, 484 U.S. 554, 559, 98 L. Ed. 2d 951, 108 S. Ct. 838 (1988);

see also *Delaware v. Fensterer*, 474 U.S. 15, 20-22, 88 L. Ed. 2d 15, 106 S. Ct. 292 (1985) (The Confrontation Clause, which guarantees an opportunity for effective cross-examination, does not guarantee "that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose" the witness' bad memory and other facts tending to discredit the witness' testimony.).

Here, the trial court's decision to exclude Harris' prior inconsistent statements was an abuse of discretion. Moreover, the trial court's actions prejudiced Stinson when it precluded him from pointing out the inconsistencies, attempted to be elicited and/or proffered during cross-examination, between Harris' trial testimony and his previous sworn testimony and his written statement. For example, it was extremely important for the defense to show what room Harris and Titus were in when the alleged incident occurred. Stinson wanted to point out that Harris had previously testified that Titus was in another bedroom when the incident occurred. Yet, during the trial, Harris testified that Titus was in the bedroom with him when the incident started.

Indeed, this was important because Titus testified during the trial that he was in the same bedroom with Harris. Moreover, Titus testified that he saw Stinson scuffling with Harris. He further testified that he saw Stinson strike Harris. Nevertheless, if Titus was in a closet in another bedroom when the incident occurred, it would have been extremely unlikely that Titus saw Stinson scuffling with Harris as Titus testified to at trial. As a result, when the trial court precluded Stinson from attacking Harris with his previous mentioned inconsistencies and from pointing out the conflicts between the testimony of Harris and Titus, it destroyed the effectiveness of defense counsel's cross-examination of Harris. "[W]hen the defense is given a full and fair opportunity to probe and expose" a prior inconsistent statement, it can be the turning point in a trial; it has the potential to blow a case apart. See *Fensterer*, 474 U.S. at 19-22. Here, the jury may have become bored by what seemed as several inept attempts by defense counsel to impeach Harris by

showing that he, on previous occasions, had made statements inconsistent with his present trial testimony.

Because the trial court's decision went outside the framework of the proper legal standards, the trial court abused its discretion in excluding Harris' prior inconsistent statements. See *Moore*, 287 Kan. at 135 (trial court abuses discretion when decision guided by erroneous legal conclusions).

## II. *Proffer of Excluded Evidence*

Stinson further argues that the trial court committed reversible error when it repeatedly refused to allow defense counsel to make a proffer of evidence of Harris' prior inconsistent statements.

The proponent of excluded evidence has the responsibility of proffering sufficient evidence to the trial court in order to preserve the issue for appeal. *State v. Evans*, 275 Kan. 95, 99, 62 P.3d 220 (2003). Under K.S.A. 60-405, a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed by reason of the erroneous exclusion of evidence unless it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge or indicated the substance of the expected evidence by questions indicating the desired answers.

Where a trial court rules that evidence is inadmissible, it is error for the trial court to refuse a proffer of that testimony into the record. See *State v. Hodges*, 241 Kan. 183, Syl. ¶¶ 3-4, 734 P.2d 1161 (1987). This is because the failure to make a proffer of excluded evidence precludes appellate review because there is no basis to consider whether the trial court abused its discretion. See *Evans*, 275 Kan. at 100.

Here, in at least two of the previous instances where Stinson attempted to examine Harris regarding his prior inconsistent statements, the trial court did not allow Stinson to complete his proffer of the statements. Clearly, the trial court should have allowed Stinson's attorney to complete his proffer of the excluded evidence. Nevertheless, based on Stinson's attorney's questions to Harris before the trial court stopped Harris' cross-examination and Stinson's attorney's dialogue with the trial court, Stinson was still able to get

into the record the substance of the excluded evidence. Moreover, the preliminary hearing transcript has been included in the record on appeal, and this court can review the prior inconsistent statements by Harris. As a result, appellate review is not precluded, and the trial court's error in refusing to allow Stinson's attorney to complete his proffers of Harris' prior inconsistent statements does not constitute prejudicial error.

III. *Harmless Error*

Because the record demonstrates that the trial court erroneously excluded Stinson from introducing Harris' prior inconsistent statements, this court's analysis now turns to whether this error entitles Stinson to a new trial.

When an appellate court concludes that a trial court erroneously admitted or excluded evidence at trial, the appellate court must then determine whether the error was harmless, that is, whether the evidence admitted or excluded had any likelihood of changing the results at trial. *State v. Boggs*, 287 Kan. 298, 318-19, 197 P.3d 441 (2008); see K.S.A. 60-261. To determine whether trial errors are harmless or prejudicial, each case must be scrutinized in the light of the record as a whole, and reversal is required only where an erroneous admission or exclusion of evidence is of such a nature as to affect the outcome of the trial and deny substantial justice. *State v. Garcia*, 282 Kan. 252, 270, 144 P.3d 684 (2006).

The State maintains that any error by the trial court with regard to the three instances at issue was harmless and does not provide a sufficient basis for the grant of a new trial. Moreover, as the State points out, the trial transcript contains several instances in which Stinson was able to demonstrate inconsistencies in Harris' trial testimony and his prior statements. On the other hand, Stinson maintains that because credibility was the key in this case, the court's rulings preventing him from attacking his accuser's credibility had a profoundly damaging effect on his case and constituted reversible error.

As Stinson correctly points out, the key to this case relied on the credibility of Harris. If the jury believed Harris' story, it would have to find Stinson guilty of the charged offenses of aggravated battery

and aggravated robbery against Harris. Harris' prior inconsistent statements, which would have allowed Stinson to test Harris' credibility, were relevant and extremely important to the jury's ultimate question as to whether Harris' story should be believed.

The jury's questions to the court during deliberations indicate that some of the jury members had doubts as to Harris' credibility. Specifically, the jury first asked the trial court whether Stinson's presence at Harris' home with the other two men, "no matter in the end who was responsible," made him also responsible under Kansas law. Next, the jury asked the trial court the following question:

"Desiring a yes or no answer. The law is what is being used as a basis for the decision and our current understanding of it will determine one way or the other. Does the law state, yes or no, that being in the same place as a crime, no matter your involvement makes [the defendant responsible for] the crime?"

Later, during deliberations, the jury posed the following questions to the trial court: "Can we be hung on two and settled on one? Or does it have to be decided on all counts? Is the jury hung if we don't decide all three counts unanimous?"

The jury's questions to the court demonstrate an apparent reluctance by at least one of the jury members to convict Stinson of two of the charged offenses. There is no way to know if the defense had been given a full and fair opportunity to probe and expose the prior inconsistent statements previously discussed whether this might have affected the ultimate outcome in his trial. If the trial court had allowed defense counsel to test Harris' credibility with the previously mentioned prior inconsistent statements, especially Harris' testimony concerning Titus' location during the incident, this might have been enough to tip the balance and create reasonable doubt that Stinson had committed the crimes in question.

As a result, we are unable to conclude that the prior inconsistent statements complained of in this appeal did not affect the outcome of the trial or deny Stinson substantial justice. Therefore, we find that it was prejudicial to Stinson for the trial court to exclude Stinson's prior inconsistent statements which put Harris' credibility in doubt and which should have been admitted under K.S.A. 60-420.

For this reason, we reverse and remand this matter for a new trial. Because we have granted a new trial, it is unnecessary to address Stinson's ineffective assistance of counsel claims.

Reversed and remanded for a new trial.