FILED
United States Court of Appeals
Tenth Circuit

August 13, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GREGORY MOORE,

        Petitioner-Appellant,

v.

DAVID R. McKUNE; ATTORNEY
GENERAL OF KANSAS,

        Respondents-Appellees.

No. 12-3326
(D.C. No. 5:11-CV-03230-SAC)
(D. of Kan.)

**ORDER DENYING CERTIFICATE OF APPEALABILITY**[*]

Before **BRISCOE**, Chief Judge, **ANDERSON**, and **TYMKOVICH**, Circuit
Judges.

Gregory Moore, a Kansas state prisoner, seeks a certificate of appealability
(COA) to enable him to appeal the district court's denial of his 28 U.S.C. § 2254
petition for a writ of habeas corpus. We have jurisdiction under 28 U.S.C.
§§ 1291 and 2253(a), and we construe Moore's filings liberally because he is
proceeding pro se. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 & n.3 (10th Cir.
1991). We conclude the district court correctly disposed of Moore's petition and
therefore deny the application for a COA and dismiss this appeal.

---

[*] This order is not binding precedent except under the doctrines of law of
the case, res judicata and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I. Background

In the early morning hours of April 9, 2005, police in Newton, Kansas, arrived at Moore's home. They had received a domestic disturbance call which they believed had escalated into a hostage situation, with Moore as the hostage-taker and his girlfriend as the hostage. The police, who knew Moore from previous encounters, believed (correctly) that he had several guns in the home.

At one point, Moore agreed to open his front door so the police could see him and his girlfriend. With the door still open, Moore's girlfriend told Moore that she was leaving, at which point Moore slammed the door closed. Police then heard what sounded like one person striking another, followed by screams from Moore's girlfriend.

The police decided to force their way into the home and rescue Moore's girlfriend. An officer broke some glass next to the doorknob, reached inside, and unlocked the door. Three heavily armed police officers then began to cross the threshold into Moore's home. As they were doing so, Moore's girlfriend rushed out. The police officers nonetheless continued to enter—apparently to arrest Moore—and he opened fire. One officer was struck in the head and died instantly. Another officer was struck multiple times but survived. At this point, Moore either voluntarily ceased fire or ran out of ammunition. Other police officers retrieved their fallen comrades and withdrew from the house.

Moore then made contact by phone with a police officer outside. Moore said he was "reloaded and ready for more blood." When the officer informed Moore that one of the other officers was dead, Moore insisted that he had been defending himself and that he would shoot any other police officer who tried to enter.

Around this time, Moore also spoke by telephone with one of his longtime friends, Thomas Taylor. Moore told Taylor what had happened and stated that he intended to go out in a "blaze of glory." Taylor nonetheless encouraged Moore to surrender. About four hours after the gunfight, Moore finally surrendered.

Moore was charged with capital murder, attempted capital murder, and various drug and firearms charges. A jury convicted him on all charges but deadlocked on whether to impose a death sentence for the capital murder charge. The trial court therefore imposed a life-without-parole sentence plus 1,094 months for the non-capital offenses.

Moore timely appealed his conviction and brought collateral review proceedings in Kansas state court. Having obtained no relief through those procedures, he filed his § 2254 petition in federal court.

We provide additional background below as relevant to specific claims.

## II. Analysis

Moore's § 2254 petition presented three grounds for relief. Grounds One and Three are effectively the same, arguing that he was denied his due process right to present a defense. We will analyze these two grounds together. Ground Two is an ineffective assistance of counsel claim. It overlaps slightly with Grounds One and Three, but is mostly distinct, and we will therefore analyze it separately.

### A. *Due Process Right to Present a Defense (Grounds One and Three)*

Understanding Moore's claims in this regard requires some detailed discussion of how his defense theories played out at trial, on appeal, and in his § 2254 petition.

### 1. *The Trial*

At trial, Moore had two defense theories. His first theory was "imperfect self-defense," based on the idea that he had an honest but unreasonable belief in the need to defend himself from the police officers entering his home. If successful on that theory, he would be guilty of voluntary manslaughter rather than capital murder. His second theory was voluntary intoxication (involving either alcohol or methamphetamine, or both), which could negate the mens rea element of capital murder.

Various witnesses offered testimony relevant to these defenses. Moore's girlfriend's daughter—who lived in the same house and had been with her mother and Moore until not long before the gunfight—testified that alcohol made Moore

"mean, violent, and paranoid." *State v. Moore*, 194 P.3d 18, 21 (Kan. 2008). But "she did not think Moore had been drinking the day or evening before the crimes, [although] she did not know." *Id.*

Moore's girlfriend herself similarly testified that Moore "had a drinking problem, that he used prescription painkillers for a back injury, and that he had begun using illegal drugs, including methamphetamine." *Id.* at 22. When Moore consumed any of these substances, "he became mean, violent, and angry." *Id.* But she had not seen Moore consume any alcohol or methamphetamine during the day leading up to the gunfight. *Id.* Moore's girlfriend further stated that when Moore learned the police were coming, "[h]e told her that he was not going to go to jail, that the police were going to try to shoot him, that there would be a 'shootout' and 'bloodbath,' and that she would die with him." *Id.* at 21.

Taylor, the friend with whom Moore spoke between the gunfight and the surrender, testified that Moore expressed his intent at that time to "go[] out in a 'blaze of glory,' [a concept] that Moore had often mentioned." *Id.* at 22. "Taylor [further] said Moore could be mean and paranoid when drinking. Taylor did not specifically testify about his impression of Moore's sobriety during their phone conversation, but he said that it seemed Moore was 'in a zone.'" *Id.* at 22–23.

A state investigator "testified that he discovered [after the gunfight] large quantities of full, partially full, and empty beer and liquor bottles at Moore's

residence." *Id.* at 23.  Another investigator discovered "drug paraphernalia consistent with narcotic use." *Id.* at 22.

Moore's most important witness was to have been a toxicology expert named Martinez.  As part of Moore's request for imperfect self-defense and voluntary intoxication jury instructions, Moore proffered Martinez's testimony by putting him on the stand outside the presence of the jury.  There, Martinez testified that he evaluated a urine sample taken from Moore shortly after he had surrendered.  According to Martinez,

> Moore's urine contained more than 7,500 nanograms per milliliter of methamphetamine and 2,709 nanograms per milliliter of amphetamine; and it had a pH of 6. Martinez said amphetamine is the major metabolite of methamphetamine, and it is generally accepted in the scientific community that the expected ratio of methamphetamine to amphetamine is 10 to 1 over a wide range of pH values.  In his view, given the amphetamine level in Moore's urine, one might extrapolate that [the] methamphetamine level [in Moore's blood at the time the urine sample was taken] was 27,000 nanograms per milliliter, a borderline lethal level . . . .

*Id.* at 23.  Martinez further "opined that methamphetamine in the level shown by Moore's urine would cause delusions, hallucinations, and bizarre, violent behavior." *Id.*

The state objected to Martinez's testimony as unreliable under the *Frye* standard.[1]  On cross-examination, therefore, the state pointed out that some of

---

[1] Kansas follows the *Frye* standard for evaluating an expert's methodology,
(continued...)

Martinez's reference authorities impugned the notion that a urine sample could say anything definitive about the actual amount of methamphetamine in a person's blood system.

Moore's counsel nonetheless argued that Martinez's testimony would be relevant to Moore's "ability to form intent, for his ability to premeditate" (*i.e.*, the voluntary intoxication question), and also "to [Moore's] perception in regards to our request for the imperfect self-defense or the voluntary manslaughter instruction in which he honestly believed that he was acting in self defense." *See* R. Vol. 2., Kan. 06-97683-S, *State v. Moore*, Aplt. Br. at 29 ("Aplt. Direct Appeal Br." filed Sept. 17, 2007, *available at* 2007 WL 3249754) (quoting trial transcript).

The trial court cut short Moore's strategy. Although it held that Martinez's testimony satisfied the *Frye* standard, it also concluded that "there was no evidence that Moore had been using drugs on the night of the crimes." *Moore*, 194 P.3d at 23. The court therefore refused to give a voluntary intoxication instruction, thus rendering Martinez's testimony in that regard inadmissible as irrelevant.

As for the imperfect self-defense instruction, the trial court likewise ruled as a matter of law that the evidence before it could not establish an honest belief

---

[1](...continued)
not the *Daubert* standard. *State v. Isley*, 936 P.2d 275, 285 (Kan. 1997).

in the need to defend one's self. The court therefore refused to give an imperfect self-defense instruction, once again rendering Martinez's testimony in that regard inadmissible as irrelevant.

Deprived of Martinez's testimony, Moore rested his defense. The jury then deliberated and returned a guilty verdict on all charges. At the sentencing phase, the jury deadlocked on the death penalty, prompting the trial court to sentence Moore to life without parole for the capital offense and 1,094 months for the non-capital offenses.

### 2. Moore's Direct Appeal

As noted, at trial, Moore's counsel argued that Martinez's testimony was relevant both to imperfect self-defense and to voluntary intoxication. On direct appeal, Moore's brief broke all of this into three claims of error: (1) the trial court should have given an imperfect self-defense instruction in light of evidence *other than* Martinez's proffered testimony, Aplt. Direct Appeal Br. at 11–21; (2) the trial court should have given a voluntary intoxication instruction in light of Martinez's proffered testimony and all of the other testimony, *id.* at 21–26; and (3) the trial court should have admitted Martinez's testimony because failing to do so deprived him of his due process right to present a defense, both as to voluntary intoxication and as to imperfect self-defense, *id.* at 27–31. "[V]iewing the overall picture of this case," Moore concluded, "the [trial] court's failure to instruct the jury on voluntary intoxication, failure to provide an instruction on

-8-

voluntary manslaughter, and failure to allow the defense to call [Martinez], are all interrelated and constitute reversible error." *Id.* at 31.

### a. *Imperfect Self-Defense*

As to imperfect self-defense, the question before the Kansas Supreme Court was whether Moore could have formed an honest (although unreasonable) belief in the need to defend himself. The court concluded that Martinez's testimony was not relevant to that question, but only to the question of voluntary intoxication. *See Moore*, 194 P.3d at 23 ("Moore requested an instruction on voluntary manslaughter based on imperfect self-defense and on voluntary intoxication, *the second conditional on the district judge's evaluation of Martinez'[s] testimony*." (emphasis added)). It therefore did not address any prejudicial effect the exclusion of Martinez's testimony might have had on Moore's imperfect self-defense theory. Instead, the court surveyed Kansas law regarding honest belief that a police officer might be about to use unlawful force, and found that Moore's situation did not fit any previous case:

> There is no question that Moore appreciated that the persons at his door were law enforcement officers, that he appreciated the reasons they had gathered outside his home and desired to enter it, and that [Moore's girlfriend] was a hostage until virtually the same moment that the police came through the door. Moore fired at the officers in spite of his undeniable knowledge of their identity and purpose. Under these circumstances, Moore simply could not have harbored an honest but unreasonable belief that the deadly force was necessary . . . .

*Id.* at 25.  The court therefore affirmed the trial court's refusal to give an imperfect self-defense instruction.

### b.  *Voluntary Intoxication*

The court then addressed Moore's second argument, *i.e.*, that the trial court should have given a voluntary intoxication instruction in light of Martinez's proffered testimony and all of the other testimony.

The court concluded an instruction should have been given.  Although the court understood that this argument intertwined with Martinez's exclusion as a witness, it chose to resolve it on narrower grounds.  It noted that there was circumstantial evidence of intoxication on the night in question (*e.g.*, the numerous half-empty beer cans in the home and Moore's attested violent disposition when intoxicated) and also testimony that no one had seen Moore drinking or using drugs in the hours prior to the gunfight.  Thus,

> [e]ven without [Martinez's] testimony . . . or admission of the urine screening report on which it relied, which we discuss below, we hold that Moore was entitled to a voluntary intoxication instruction.  It is clear from the record before us that the [trial] judge weighed the evidence supporting and undercutting the instruction rather than simply determining whether the minimum evidence necessary to require the instruction was present.  The circumstantial evidence of Moore's voluntary intoxication at the time of the crimes may not have been strong, but it was adequate to support an instruction.

*Id.* at 26 (citation omitted).

But, the court said, "Moore made repeated and cogent, though tragically misguided, statements about his expectations for the evening, about a 'bloodbath,' and about his demise in a 'blaze of glory.' Those expectations were, at least in part, realized." *Id.* Thus, "given the enormous weight of the evidence against Moore," the court held that the trial court's error was harmless. *Id.* "This is true," it continued, "regardless of whether we view the error as one of constitutional magnitude, infringing on Moore's right to present his theory of defense, or as nonconstitutional trial error." *Id.*

### c. *Exclusion of Martinez's Testimony*

Finally, the court addressed the effect of Martinez's inability to testify. The court acknowledged that this was a "problematic" issue "because the [trial court] never explicitly ruled that the testimony could *not* be admitted." *Id.* at 27 (emphasis added). Instead, the trial court ruled that Martinez's testimony could be admitted—at least under the *Frye* standard—but also that no voluntary intoxication instruction would be given. Thus, "[a]ny further decision the judge may have made on" other matters of admissibility, such as "whether an appropriate foundation had been laid for the opinion and whether the opinion itself was relevant and helpful to the jury were short-circuited by ruling that no voluntary intoxication instruction would be given and abandonment of the defense attempt to use Martinez to support Moore's theory of the case." *Id.* The Kansas Supreme Court characterized this as an "unusual order of events" and recognized

-11-

that "without a voluntary intoxication instruction, there was nothing that Martinez could say that would be helpful to the jury or exculpatory for Moore." *Id.*

"In circumstances other than those before us," the court went on, "we might find this order of events and the interrelationship between Moore's appellate arguments on the voluntary intoxication instruction and on Martinez'[s] testimony troubling." *Id.* But in this circumstance, the court's "examination of Martinez'[s] proffer convince[d] [it] that there was nothing [Martinez] could have contributed to the jury's understanding of the case, even if the jury had been given a voluntary intoxication instruction." *Id.* This was so, the court said, for three reasons.

First, the court appeared to predict that the trial judge would have excluded Martinez's expert testimony anyway. Unlike the Federal Rules of Evidence, "Kansas law requires an expert's opinion to be supported by admitted evidence." *Id.* But in Moore's case, "the report of the urine screening performed shortly after [he] was arrested [and on which Martinez relied] was not admitted into evidence. No foundation for it was laid, and no hearsay exception was established." *Id.*

Second, the court held that Martinez lacked sufficient information to make his testimony helpful to the jury. "Martinez admitted that he needed more information to opine on Moore's actual impairment at the time of the crimes." *Id.*

-12-

In particular, Martinez "was unable to testify about the timing of Moore's ingestion of drugs or the effect the drugs actually had on him in particular." *Id.*

Third, "Moore did not object to the order of the proceedings before, or the order of the decisions made by, the [trial] judge.  And his arguments on appeal rest on the presumption that all necessary evidence had been considered by the [trial] judge when he made his rulings on this and other issues." *Id.* at 28.

Thus, "[u]nder what we are certain will be the unusual circumstances of this case," the court concluded, "we are confident there was no error in the district judge's treatment of Martinez'[s] testimony." *Id.*

### 3.  *Moore's Habeas Arguments*

In Moore's § 2254 petition in federal district court, his first ground for relief reads as follows:

> **Petitioner Was Denied His Right To Present A Defense In Violation Of His Sixth And Fourth Amendments [*sic*].**  Petitioner had two defense theories for his defense, at trial he was denied his right to present expert testimony in support of his defense of Voluntary Intoxication.  The Court improperly and with prejudice excluded the expert's testimony in violation of the Sixth and Fourteenth amendments.  There was scientific evidence relied upon in petitioner's penalty-phase, which should had [*sic*] been admitted and allowed during petitioner's guilt-phase of his trial.

R. Vol. 1 at 8.  Moore's third ground for relief states:

> **It Is Plain Error For Trial Court To Deny Giving Jury Requested Instruction Vital To Defense In Violation Of Sixth Amendment.**  Petitioner presented

-13-

> evidence sufficient and supportive in weight to warrant the jury to be instructed of Voluntary Intoxication. This legal statutory defense was entitled [*sic*] petitioner under the theories of his defenses. The trial court relied on irrelevant facts to exclude petitioner's expert witness testimony for the purpose of denying him the right to have the jury instructed on his defense.

R. Vol. 1 at 11. As Moore's district court filings acknowledge, Ground Three "is redundant to Ground One." *Id*. at 73.

Perhaps most notable about these arguments is what they do not claim. As noted, at trial and on direct appeal, Moore argued that Martinez's testimony was relevant both to his voluntary intoxication and imperfect self-defense theories, but the Kansas Supreme Court treated Martinez's testimony as relevant only to the voluntary intoxication question. If Moore's § 2254 petition had continued to frame Martinez's testimony as relevant to the imperfect self-defense theory, he might have received de novo review on that claim because he presented it to the Kansas Supreme Court but that court misunderstood it and therefore failed to rule on it. *See, e.g.*, *Cone v. Bell*, 556 U.S. 449, 472 (2009) (de novo review for claims on which the state court "did not reach the merits").

As it stands, however, Moore's § 2254 petition raised Martinez's testimony only in the context of his voluntary intoxication defense. Moore's other pleadings below do likewise, raising the imperfect self-defense theory only as part of his ineffective-assistance-of-counsel claim (and in a manner unrelated to Martinez), not as part of his denial-of-defense claims. *See* R. at 57–74.

-14-

The district court determined that the Kansas Supreme Court's decision with regard to Martinez's testimony satisfied AEDPA's deferential standard for two reasons: (1) the testimony was inadmissible under constitutionally valid evidentiary rules, and (2) "[e]ven if the urine screening had been admitted, it remains equally likely that [Moore] took methamphetamine after the crimes occurred (around 4:00 a.m.) but before his arrest (around 8:00 a.m.)." R. Vol. 1 at 88.

As to the Kansas Supreme Court's conclusion that it was harmless error for the trial court to deny a voluntary intoxication instruction even without Martinez's testimony, the district court ruled that the Kansas Supreme Court reasonably concluded under U.S. Supreme Court precedent that the error was harmless.

### 4. Analysis

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal quotation marks omitted). But this right is not absolute. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988).

The Kansas Supreme Court recognized that the trial court's refusal to give a voluntary intoxication instruction potentially violated Moore's right to present a

-15-

defense. It disposed of that in two ways: (1) in light of all the evidence other than Martinez's proffered testimony, the court explicitly found a potential constitutional error in the trial court's denial of the voluntary intoxication instruction—but also that the error was harmless beyond a reasonable doubt; and (2) Martinez's testimony, whatever effect it might have had on Moore's voluntary intoxication theory, was inadmissible under state rules of evidence.

The district court analyzed each of these holdings in turn. In so doing, it correctly recognized that its task was not to determine whether the Kansas Supreme Court correctly applied U.S. Supreme Court precedent in some absolute sense, but only whether the Kansas Supreme Court's decision "involved an unreasonable application of[] clearly established Federal law[] as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The state court's conclusions do not fail this deferential standard. First, concerning the denial of the voluntary intoxication instruction, the Kansas Supreme Court was correct that such errors—even if they deny a defendant his right to present a defense—can be harmless. *See, e.g.*, *Delaware v. Van Arsdall*, 475 U.S. 673, 682 (1986); *Crane*, 476 U.S. at 691. The district court's task on habeas review was to determine if the Kansas Supreme Court applied the U.S. Supreme Court's harmless error rule in an objectively unreasonable way. *See Saiz v. Burnett*, 296 F.3d 1008, 1012 (10th Cir. 2002) (where state appellate court finds constitutional error in trial court's exclusion of a proffered testimony but

-16-

deems the error harmless, federal habeas court's review is limited to whether the state court's "application of the [harmless error] standard was objectively unreasonable").  Applying this standard, the district court stated, "The Kansas Supreme Court reasonably found that the weight of the evidence against [Moore] was 'enormous.'"  R. Vol. 1 at 91.  Having reviewed the record ourselves, we believe fair-minded jurists would not disagree with this conclusion.  Accordingly, this issue does not merit a COA.

Second, concerning the inadmissibility of Martinez's testimony, the Kansas Supreme Court was correct that state evidentiary rules limit a defendant's right to present a defense.  *Taylor*, 484 U.S. at 410.  But state evidentiary rules may not be "arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*,  547 U.S. 319, 324 (2006).  The question for the district court was whether the Kansas Supreme Court unreasonably applied U.S. Supreme Court law in this regard.  The district court resolved this question not by holding that the Kansas Supreme Court could reasonably conclude its evidentiary rules were permissible, but that those evidentiary rules in fact "serve the interests of fairness and reliability, and are not arbitrary or disproportionate to the purposes they are designed to serve."  R. Vol. 1 at 88.  While this conclusion goes further than habeas review needs to go, within it is an obvious conclusion that the Kansas Supreme Court reached an objectively reasonable conclusion.

Fair-minded jurists would not disagree with the district court in this regard, although the question requires us to resolve several complications not fully developed below.

To begin, the Kansas Supreme Court noted that the urine screening report, on which Martinez's testimony relied, had not been admitted into evidence—in violation of Kansas's requirement that experts base their testimony on admitted evidence. Although this rule differs from the Federal Rules of Evidence, Moore has not cited—nor could we find—any authority for the notion that the Federal Rules approach embodies a constitutional standard. Thus, there is no clearly established U.S. Supreme Court precedent that would undermine the Kansas Supreme Court's application of its admitted-evidence requirement.

Next, the Kansas Supreme Court treated its expert evidence rules as self-executing, rather than as rules to be applied when a party objects. This is so because the record or briefing does not disclose that the prosecution objected to the admission of the report. At face value, the court's conclusion seems inconsistent with prior Kansas precedent. For example, the Kansas Supreme Court has elsewhere stated that "evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *State v. King*, 204 P.3d 585, 596 (Kan. 2009). But to the extent that Moore could claim that the Kansas court supposedly departed from its precedent specifically to avoid reversal in his case, *see, e.g.*, *Cummings v.*

-18-

*Sirmons*, 506 F.3d 1211, 1237–38 (10th Cir. 2007), such a claim—if it exists at all—would need to be raised and exhausted separately. Moore has not done so. And in any event, the Kansas Supreme Court's pronouncement in *King* was rooted in a Kansas statute requiring a timely evidentiary objection in the trial court before an appellate court may "set aside" any verdict or finding or "reverse" any judgment on an evidentiary error. Kan. Stat. Ann. § 60-404 (emphasis added). The rule that evidentiary errors should not be reviewed unless timely objected to in the trial court apparently has nothing to do with an appellate court's prerogative to uphold a judgment on alternate grounds. *See State v. Hoge*, 150 P.3d 905, 910 (Kan. 2007). We have located no clearly established Supreme Court precedent holding that where certain evidence has been excluded on erroneous grounds, a state may not affirm the exclusion on alternate grounds, including on other rules of evidence that are normally not self-executing.

Finally, to the extent Moore was planning to proffer the report to the jury, the Kansas Supreme Court stated,

> [W]e observe that Moore did not object to the order of the proceedings before, or the order of the decisions made by, the [trial] judge. And his arguments on appeal rest on the presumption that all necessary evidence had been considered by the judge when he made his rulings on this and other issues.

*Moore*, 194 P.3d at 28. This can be understood as a conclusion Moore's counsel waived any argument along the lines of not having yet had an opportunity to lay a

proper foundation. We are aware of no clearly established Supreme Court precedent stating that typical waiver rules like this are somehow "arbitrary or disproportionate to the purposes they are designed to serve." *Holmes*, 547 U.S. at 324.

The district court also reasoned, "Even if the urine screening had been admitted, it remains equally likely that [Moore] took methamphetamine after the crimes occurred (around 4:00 a.m.) but before his arrest (around 8:00 a.m.)." R. Vol. 1 at 88. This responds to the implicit conclusion in the Kansas Supreme Court's opinion. Not only did the court determine that Martinez's testimony was inadmissible under evidentiary rules, but the court also appears to have determined that its exclusion was harmless: "there was nothing [Martinez] could have contributed to the jury's understanding of the case, even if the jury had been given a voluntary intoxication instruction." *Moore*, 194 P.3d at 27. In particular, Martinez admitted he did not have sufficient information "to testify about the timing of Moore's ingestion of drugs." *Id.* Timing, of course, was the crucial point. Accordingly, the Kansas Supreme Court did not unreasonably apply U.S. Supreme Court precedent in concluding that exclusion of Martinez's testimony was harmless.[2]

_____

[2] Moore notes in his habeas petition that Martinez's testimony was admitted at the penalty phase. R. Vol. 1 at 8. He further argues in his application for a COA that Dr. Martinez's testimony "influenced the outcome of the penalty-phase trial," Aplt. Br. at 12, apparently alluding to the fact that the jury

(continued...)

For all these reasons, we conclude that no fair-minded jurist could disagree with the district court's disposition of Moore's claims related to Martinez's proffered testimony.  There is no basis on which to grant a COA on these claims.

## B. Ineffective Assistance of Counsel (Ground Two)

### 1. State Collateral Review

In a state collateral review petition, Moore raised six ineffective assistance of counsel claims, although only the first two are relevant now (Moore has abandoned the rest).  The Kansas Court of Appeals rejected these claims in an unpublished disposition.  R. Vol. 2, *Moore v. State*, No. 10-104267-A, 2011 WL 2555655 (Kan. Ct. App. June 24, 2011) (per curiam).

In Moore's first claim, he argued that his attorney failed to investigate certain blood samples.  Soon after the crime, the state drew nine vials of blood from Moore.  Moore's attorney did not have these vials tested for methamphetamine.  Moore claimed that his voluntary intoxication defense would

---

[2](...continued)
deadlocked on whether to give him the death penalty.  "[I]f the defense's expert witness'[s] testimony influenced the penalty-phase of his trial," Moore says, "then it goes to show that his testimony could and would have changed the result of the guilt-phase of his trial."  *Id.* (emphasis removed).  Moore's argument appears to be grounded in U.S. Supreme Court decisions holding, under the circumstances of the particular case, that a valid evidentiary rule nonetheless needed to give way to accommodate the particular defendant's right to put on a defense.  *See Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam); *Davis v. Alaska*, 415 U.S. 308, 317-21 (1974).  But the premise of Moore's argument—that the jury deadlocked because of Martinez's penalty-phase testimony—is speculation and is inadequate to preserve a challenge to the Kansas Supreme Court's resolution of the issue.

have been much stronger with the blood samples (as opposed to just the urine sample). But the Court of Appeals held that Moore could not establish the prejudice prong of an ineffective-assistance claim "given the overwhelming evidence against him as highlighted by the [Kansas] Supreme Court in [its disposition of Moore's direct appeal]." *Id.* at *3.

Moore's second claim argued that "his attorney was ineffective when he failed to investigate why Deputy Kurt A. Ford (who was killed) was carrying a rifle magazine that was missing several rounds." *Id.* "If it could be determined that Ford fired the first shot," Moore believed that he would have been better able to present his imperfect self-defense theory. *Id.* The Court of Appeals rejected this claim on both of the ineffective-assistance prongs. As to the attorney's diligence, "there was absolutely no evidence in the record to suggest that Ford fired his rifle at all; therefore, there was no objective reason for Moore's attorney to investigate." *Id.* As to prejudice, the facts of the case as interpreted by the Kansas Supreme Court showed that Moore could not establish an imperfect self-defense theory is a matter of law: "Moore knew that he was holding a hostage; he knew that the people outside the door were police officers and wanted to enter to protect the hostage; and . . . Moore fired at the officers despite this fact." *Id.* at *4.

The Court of Appeals therefore denied Moore's collateral review petition.

### 2. *Moore's Habeas Arguments*

In his § 2254 petition, Moore framed his ineffective-assistance claim as follows:

> **Petitioner's Trial Counsel Was Prejudicially Inadequate And Ineffective In Violation Of His Sixth And Fourteenth Amendments [*sic*].** Petitioner's trial counsel made cumulative errors regarding petitioner's right to present an adequate defense. Trial counsel failed to continue the trial to have blood samples tested. Trial counsel presented intentionally false testimony regarding the existence of blood samples. Trial counsel failed to properly prepare its expert witness vital for the defense of Voluntary Intoxication and Imperfect Self Defense. In violation of petitioner's Sixth and Fourteenth amendments [*sic*].

R. Vol. 1 at 9.

In response, the state argued that Moore had procedurally defaulted on certain of these theories for failure to raise them in the Kansas courts. Specifically, the state claimed that Moore had not previously raised the theories of cumulative error, failure to move for a continuance to test the blood samples, and false testimony regarding the blood samples. The district court agreed, deemed these theories procedurally defaulted, and therefore analyzed only two theories on their merits: failure to support the voluntary intoxication defense (by failing to have the blood samples tested) and failing to support the imperfect self-defense theory (by failing to investigate whether the slain officer had fired first).

As to both theories, the district court held that the Kansas Court of Appeals had not applied the U.S. Supreme Court's ineffective-assistance precedents in an objectively unreasonable manner. Accordingly, the district court denied Moore's petition.

### 3. Analysis

### a. Default

Moore first challenges the district court's conclusion that he had procedurally defaulted on certain ineffective-assistance theories for failure to raise them in state court.

As to his cumulative error theory, Moore does not deny that he never raised it in state court. Instead he asserts that "all claims of IAC must be considered cumulatively. This is simply the standard for reviewing an IAC issue." Appl. at 24 (citations omitted). We need not reach this question because we agree with the district court that cumulative error only applies where more than one actual error has been established. *See Hoxsie v. Kerby*, 108 F.3d 1239, 1245 (10th Cir. 1997) ("Cumulative-error analysis applies where there are two or more actual errors. It does not apply, however, to the cumulative effect of non-errors." (citation omitted)). And as explained further below, we likewise agree that Moore has established no colorable claim to error. This question of procedural default as to cumulative error is therefore moot, and we need not reach it.

Concerning Moore's theories that his counsel should have moved for a continuance to test the blood samples and that his counsel falsely denied the existence of the blood samples, we likewise need not reach the question of procedural default. These contentions are arguably just aspects of Moore's overall argument that counsel might have bolstered the voluntary intoxication theory by having the blood samples tested. That overall argument is not actually stated in Moore's habeas petition, but his other papers below bring it out clearly, *see* R. Vol. 1 at 65–70, and the district court was correct to consider it given Moore's pro se status. Accordingly, we do not decide whether these contentions were procedurally defaulted.

### b. Merits

To establish ineffective assistance of counsel, Moore must show both that his trial counsel fell below objective standards of reasonableness and that he suffered prejudice as a result of counsel's failures. *Strickland v. Washington*, 466 U.S. 668, 687–88, 691–95 (1984). A defendant shows prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### i. The Voluntary Intoxication Defense

Moore believes his counsel was constitutionally ineffective because counsel did not have the blood vials tested for methamphetamine. The Kansas Court of

Appeals rejected this claim on the prejudice prong "given the overwhelming evidence against him as highlighted by the [Kansas] Supreme Court in [its disposition of Moore's direct appeal]." R. Vol. 2, *Moore*, 2011 WL 2555655, at *3. The district court deemed this a reasonable application of *Strickland*.

We cannot conclude the Kansas Court of Appeals unreasonably applied *Strickland*. The fundamental problem with Moore's claim is that he presents no evidence of what the blood tests would have revealed. His argument is based entirely on speculation that such tests would support his voluntary intoxication defense. But the *Strickland* prejudice prong may not be satisfied through speculation. *See, e.g.*, *Eisemann v. Herbert*, 401 F.3d 102, 108–09 (2d Cir. 2005); *United States v. Gray*, 878 F.2d 702, 712 (3d Cir. 1989); *United States v. Peterson*, 896 F. Supp. 2d 305, 316 (S.D.N.Y. 2012); *cf. Miller v. Terhune*, 510 F. Supp. 2d 486, 498 (E.D. Cal. 2007) (finding prejudice in part because "both of petitioner's trial attorneys testified that they were aware of the fact that petitioner's blood alcohol level was .30 three hours after the shooting occurred" yet neither of the petitioner's attorneys adequately investigated the viability of a voluntary intoxication defense). No court can say that "the result of the proceeding would have been different," *Strickland*, 466 U.S. at 694, without knowing what the tests would reveal.

Moore, of course, cannot test the blood samples himself.[3]  But if he indeed ingested methamphetamine prior to the gunfight, he should know what the tests would reveal.  After a thorough review of the record, we cannot find any statement from Moore affirming that he ingested the drugs, or a statement of how much he ingested and when.  The closest he comes is an assertion made in a pleading in which he claims that the urine sample "clearly establishes that petitioner had used a very large amount of meth at least 24 hours prior to the shooting incident."  R. Vol. 1 at 69–70.[4]

Such circumlocution does not suffice.  While we construe pro se filings liberally, we cannot credit an argument without evidence.  As one court said in a Rule 12(b)(6) context, "when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist." *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976).  The same holds true for habeas petitions.

We see no basis for granting a COA on this claim.

---

[3]  Moore requested (and was denied) an evidentiary hearing from the Kansas collateral review court—but not as a means to test the blood samples. Rather, he requested a hearing regarding whether his trial counsel's actions had been strategic rather than inadvertent. *See* R. Vol. 2, *Moore v. State*, No. 10-104267, Aplt. Br. at 3–4, 10–11 (Kan. Ct. App., filed Oct. 26, 2010), *available at* 2010 WL 4923669.

[4]  We express no opinion whether Moore could still have the blood samples tested, but note that Kansas law may allow additional post-conviction proceedings in certain circumstances. *See* K.S.A. § 60-1507; Kan. Sup. Ct. R. 183(c)(4) & (d).

### ii. Failure to Prepare Martinez Adequately

There is a second aspect of Moore's ineffective-assistance claim that the district court did not address. Moore argues that his counsel failed to adequately prepare Martinez to testify. Moore has elaborated on this argument in various ways.

In state collateral review proceedings, where Moore was represented by counsel, he argued that his trial counsel's failure to get the urine screening report into evidence prejudiced him, given that the Kansas Supreme Court in part relied on that failure to declare Martinez's testimony inadmissible. *See* R. Vol. 2, *Moore v. State*, No. 10-104267, Aplt. Br. at 5 (Kan. Ct. App., filed Oct. 26, 2010), *available at* 2010 WL 4923669. In other words, the Kansas Supreme Court could not have excluded Martinez's testimony as easily if trial counsel had put the urine screening report into evidence before Martinez's proffer.

In § 2254 proceedings, where Moore represented himself, he argued this point somewhat differently. Specifically, his argument centered on the state's cross-examination, in which Martinez admitted that his own treatises seem to say that urine concentration is a poor proxy for actual amounts ingested, timing of ingestion, and so forth. This was also something on which the Kansas Supreme Court relied in declaring Martinez's testimony unhelpful. Moore therefore argued that his counsel "failed to read enough of the relevant text to know what the state would try to rebut Dr. Martinez's testimony with." R. Vol. 1 at 66.

In his application for a COA, still representing himself, Moore has returned to his state collateral review argument: "[D]efense counsel failed to even offer the urine screening report into evidence, laying a proper foundation for Dr. Martinez's expert testimony. Due to trial counsel's IAC, Martinez was not able to present the reliability of his expert assessment of the level of methamphetamine in Appellant's urine screening." Aplt. Br. at 25 (citation omitted).

We deem Moore to have forfeited any argument based on failure to admit the urine screening into evidence. Although he raised it in state collateral review proceedings, he abandoned it in the district court. We therefore do not reach it.

As for the argument based on trial counsel's failure to read Martinez's treatise, we see no prejudice. The treatise said what it said, regardless of whether trial counsel adequately reviewed it. There was no way trial counsel could put on Martinez without facing the impeachment problem he actually faced.

Accordingly, we see no basis to grant a COA.

### iii. The Imperfect Self-Defense Theory

Moore's final ineffective-assistance theory has changed since state collateral review proceedings. There, he relied on counsel's failure to investigate the supposed notion that the slain officer had fired his rifle first. Here, however, Moore blends this argument with his previous arguments about being high on

methamphetamine. In other words, he argues that being high can factor into an honest yet unreasonable belief about the need to defend one's self.

The district court addressed this argument only with respect to whether the slain officer had fired his rifle first. As to this aspect of the argument, the district court concluded—and we agree—that the Kansas Court of Appeals reasonably applied *Strickland* when it found that counsel had not behaved deficiently.

The district court did not address the intoxication aspect of the argument, which was likely procedurally defaulted. But AEDPA exhaustion is not jurisdictional, and so the state's failure to object gives us discretion to address the argument. *See, e.g.*, *Young v. Conway*, 698 F.3d 69, 86 & n.11 (2d Cir. 2012). We choose to exercise our discretion and reach the argument because the Kansas Supreme Court's decision has already resolved it. Specifically, we read the Kansas Supreme Court's decision as establishing that someone "who appreciate[s] that the persons at his door [are] law enforcement officers" and "appreciate[s] the reasons they had gathered outside his home and desire[] to enter it" (namely, to rescue a hostage) cannot, as a matter of law, form an honest belief in the need to defend himself. *Moore*, 194 P.3d at 25. The evidence shows that Moore embodied these requirements, and he therefore had no viable imperfect self-defense theory regardless of whether he was intoxicated at the time.

There is no basis to grant a COA on this issue.

# III. Conclusion

For the reasons stated above, we DENY Moore's application for a COA and DISMISS this appeal.

ENTERED FOR THE COURT

Timothy M. Tymkovich
Circuit Judge